# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROTECH HEALTHCARE INC.,**

**Plaintiff,**

**v.**                                      **Case No. 6:23-cv-2338-JA-RMN**

**JEFFREY CARMICHAEL,**

**Defendant.**

---

## ORDER

This case is before the Court on Plaintiff, Rotech Healthcare Inc.'s motion for partial summary judgment (Doc. 62), Defendant, Jeffrey Carmichael's response (Doc. 67), and Rotech's reply (Doc. 68). Based on the Court's review of the parties' submissions, the motion must be granted in part and denied in part.

## I.    BACKGROUND

Rotech is a medical device retailer headquartered in Orlando, Florida, that sells respiratory devices and other home medical equipment nationwide through its subsidiaries, including Hook's Oxygen & Medical Equipment. (*See* Doc. 1 ¶ 4; Doc. 63-1 ¶¶ 3–4, 7). In October 2021, Rotech[1] hired Mr. Carmichael as an account executive to work in the Indianapolis, Indiana metropolitan

---

[1] Mr. Carmichael was officially employed by Hook's, a subsidiary of Rotech. (*See* Doc. 27-3). To avoid confusion, the Court will refer to Mr. Carmichael's employment as having been with Rotech.

area—his first work experience in the medical device industry. (Doc. 63-1 ¶¶ 31–32; Doc. 63-2 at 19:4–6). As a condition of his employment, Mr. Carmichael electronically signed an offer of employment containing nondisclosure, nonsolicitation, and noncompetition covenants. (*See* Doc. 1-1). His employment with Rotech began amid the COVID-19 pandemic, which required him to perform many of his job functions through remote-access technology and to engage in "eLearning"—an undefined term in the parties' contract. (Doc. 63-1 ¶¶ 24–26). During his onboarding, Rotech trained Mr. Carmichael on its product lines, sales techniques, and regulatory compliance, but not on eLearning. (*Id.* ¶¶ 11–13; Doc. 67-1 ¶ 2).

As an account executive, Mr. Carmichael's primary responsibility was to develop referral relationships for Rotech with "both physician and non-physician referral sources" in northern Indianapolis. (Doc. 62 at 1; Doc. 63-1 ¶¶ 4, 8, 9; Doc. 63-2 at 13:12–18). Once a Rotech account executive solidifies a referral relationship, it is standard for the referral source to direct business to Rotech through that account executive. (*Id.* ¶ 18). To facilitate Mr. Carmichael's job functions, Rotech granted him access to its proprietary referral-source database, which identifies referral-source decisionmakers and contains analytics regarding referral patterns and order histories. (*Id.* ¶¶ 30–31, 34). Rotech also provided Mr. Carmichael with a budget to purchase lunches for

2

referral-source contacts to assist with his business development efforts. (*Id.* ¶ 33).

Rotech required Mr. Carmichael to complete weekly "call planners" and "call reports"—Excel spreadsheets where account executives record pertinent information about referral sources, sales activity, account statuses, and account executives' personal notes. (*Id.* ¶¶ 41–45). Account executives were expected to submit these documents to their local Rotech manager for review. (*Id.* ¶ 42). Access to Rotech's referral-source database was password-protected and available only to its employees through secure login. (*Id.* ¶ 34). Mr. Carmichael's weekly call planner and call report contained the names of dozens of accounts representing different healthcare providers in Indianapolis, the identities of individuals he spoke to at those companies, a log of face-to-face sales calls, and his strategic notes—including his impressions of the top ten prospective accounts. (*See* Doc. 63-1 at 17–37).

On June 6, 2023, Mr. Carmichael forwarded his weekly call planner and call report from his Rotech email account to his personal email. (*Id.* ¶ 39; Doc. 67-1 ¶ 5). Two days later, he resigned from Rotech and joined Total Respiratory—a competitor of Rotech's—where he continued selling home medical equipment in Indiana. (Doc. 63-2 at 27:21–28:10, 31:22–32:3). At Total Respiratory, Mr. Carmichael worked with at least twenty-nine of the same

3

referral sources as he did at Rotech. (*Compare* Doc. 1-1 at 4, 6, 9 *with* Doc. 63-2 at 47:12–20, 23–24, 54–63). However, Mr. Carmichael states in his declaration that he never used the weekly call planner or call report after he left Rotech and that he did not solicit Rotech's referral sources. (Doc. 67-1 ¶¶ 5–9).

Rotech claims that from July 2022 to June 2023—while Mr. Carmichael worked for Rotech—the referral sources that Mr. Carmichael worked with generated $1,650,566 in net revenue to Rotech. (Doc. 63-2 ¶ 13), But from July 2023 through June 2024—the year after Mr. Carmichael left Rotech to work for Total Respiratory—Rotech only generated $36,297 from those same sources. (*Id.*). The trend continued the following year, with Rotech's revenue down to $32,453 from those referral sources, bringing Rotech's claimed losses to $1,781,041.92 over two years. (*Id.*). Meanwhile, Mr. Carmichael generated $52,364.09 in net revenue for Total Respiratory from the same sources that he previously worked with at Rotech. (*See* Doc. 62-3 at 6–7).

Six months after Mr. Carmichael left to work for Total Respiratory, Rotech filed this lawsuit against him. (*See* Doc. 1). Rotech asserts claims of: misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (DTSA) (Count I) and the Florida Uniform Trade Secrets Act, §§ 688.001–688.003, Fla. Stat. (FUTSA) (Count II); breach of the nondisclosure, nonsolicitation, and noncompetition provisions of Mr. Carmichael's employment

4

agreement (Counts III–V); tortious interference with Rotech's business relationships (Count VI); and breach of the duty of loyalty (Count VII). (*See generally* Doc. 1). Rotech now moves for partial summary judgment as to its claims for trade-secret misappropriation, violation of the restrictive covenants, and tortious interference. (Doc. 62).

## II.    LEGAL STANDARDS

On a motion for partial summary judgment, a district court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Wesson v. Huntsman Corp.*, 206 F.3d 1150, 1152 (11th Cir. 2000). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The movant "bears the initial responsibility of informing the district court of the basis for its motion" and "identifying those portions" of the record that 'it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he burden then shifts to the

5

non[]moving party" to "present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To satisfy its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.   DISCUSSION

### A.    Misappropriation of Trade Secrets

Rotech moves for summary judgment on Mr. Carmichael's liability for misappropriation of trade secrets based on his transmission of his weekly call planner and call report to his personal email account, in alleged violation of DTSA, 18 U.S.C. § 1836(b)(1), and FUTSA, §§ 688.001–688.003, Fla. Stat. Mr. Carmichael argues that: (1) the documents are not trade secrets because they contain only generic information and Rotech "expect[ed] that Carmichael would retain . . . referral source information[] upon his termination" and (2) even if they are trade secrets, there is no direct evidence that he ever used or disclosed the documents. (Doc. 67 at 5–8 (quoting Doc. 62 at 24)). It is undisputed that Mr. Carmichael forwarded these documents from his Rotech account to his personal email; the question is whether his conduct constitutes misappropriation of trade secrets.

To prevail on a misappropriation claim, a plaintiff must show that it (1) "possessed secret information and took reasonable steps to protect its secrecy"

6

and (2) the information "was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1351 (M.D. Fla. 2019) (quoting *Audiology Distrib., LLC v. Simmons*, 8:12-cv-02427, 2014 WL 12620835, at \*1 (M.D. Fla. Jan. 8, 2014)). "Put another way, '[t]he DTSA contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use.'" *Fla. Beauty Flora Inc. v. Pro Intermodal LLC*, No. 20-20966-CIV, 2021 WL 1945821, at \*4 (S.D. Fla. May 14, 2021) (alteration in original) (quoting *Robillard v. Opal Labs, Inc.*, 428 F. Supp. 3d 412, 451–52 (D. Or. 2019)).

DTSA defines a "trade secret" to include a variety of business or technical information that "derives independent economic value . . . from not being generally known" and that the owner "t[ook] reasonable measures to keep . . . secret." 18 U.S.C. § 1839(3). DTSA contains "no precise definition" of what constitutes "reasonable measures" to ensure secrecy. *WWMAP, LLC v. Birth Your Way Midwifery*, 711 F. Supp. 3d 1313, 1321 (N.D. Fla. 2024) (quoting *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 768 (10th Cir. 2011)). In assessing whether reasonable measures were taken, courts consider "the nature of the purported secret, the economic value of the secret relative to the costs of employing various security measures, the probability of misappropriation, the

7

magnitude of the harm that would result from misappropriation, the size of the business and the number of its employees, and the extent of the business's need to disseminate the secret to exploit its economic value." *Id.* at 1321–22 (citing *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179–80 (7th Cir. 1991), and *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 380 (N.D.N.Y. 2021)). "So long as the precautions taken were reasonable, it [does not] matter that the defendant found a way to circumvent them." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1312 (11th Cir. 2020). Moreover, the Supreme Court has explained that the "economic value" of a trade secret "lies in the competitive advantage over others" that a possessor "enjoys by virtue of its exclusive access to the [secret]." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984).

DTSA defines "misappropriation" as both the improper acquisition of a trade secret and its unauthorized disclosure or use by someone under a duty to maintain confidentiality. *See* 18 U.S.C. § 1839(5). FUTSA provides a materially identical definition. *See* § 688.002, Fla. Stat. However, "'improper' is not coterminous with 'unlawful.'" *WWMAP, LLC,* 711 F. Supp. 3d at 1323 (citing *Compulife Software*, 959 F.3d at 1312). "Misappropriation . . . is a forgone conclusion where a trusted employee discloses trade secrets after receiving them under circumstances of obvious confidentiality and contractual obligations." *Stoneworks, Inc. v. Empire Marble & Granite Inc.*, No. 98-2017-CIV, 1998 WL

998962, at *4 (S.D. Fla. Nov. 20, 1998). "Florida law imposes upon every employee a duty not to use the employer's trade secrets for his own benefit, if the secret was acquired by the employee in the course of his employment." *Se. Mech. Servs., Inc. v. Brody*, No. 8:08-cv-1151-T, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008).

For a customer list to qualify as a trade secret, there must be evidence that the list "was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for [a] unique business." *Zodiac Recs. Inc. v. Choice Env't Servs.*, 112 So. 3d 587, 590 (Fla. 4th DCA 2013) (alteration in original) (quoting *East v. Aqua Gaming*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001).[2] Indeed, "[a] customer list can constitute a 'trade secret' where the list is acquired or compiled through the industry of the owner of the list and is not just a compilation of information commonly available to the public." *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310 So. 3d 45, 48 (Fla. 4th DCA 2020) (quoting *E. Colonial Refuse Serv., Inc. v. Velocci*, 416 So. 2d 1276, 1278 (Fla. 5th DCA 1982)). In *Bridge Financial*, the

---

[2] "A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983).

9

customer list was considered a trade secret because "the plaintiff showed that it had spent a significant amount of time, money, and effort to develop the list which was kept on a password protected server not available to the public." *Patient Depot, LLC v. Acadia Enters., Inc.*, 360 So. 3d 399, 408 (Fla. 4th DCA 2023) (citing *Bridge Fin.*, 310 So. 3d at 49).

Here, the weekly call planner and call report contain detailed information about Rotech's clients, including the identities of individuals involved in their decision-making processes, a log of face-to-face sales calls, and strategic notes— none of which is readily available to the public. (*See* Doc. 63-1 at 17–37). Rotech invests considerable time and money in training account executives like Mr. Carmichael to obtain the information necessary to compile these documents, requires its employees to execute confidentiality agreements, and keeps these documents on password protected servers. Courts applying Florida law under similar circumstances have consistently considered customer lists like the one at issue here to be trade secrets. *See, e.g., Bridge Fin., Inc.*, 310 So. 3d at 48; *Marlite, Inc. v. Eckenrod*, No. 09-22607-CIV, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011); *Stoneworks Inc. v. Empire Marble & Granite Inc.*, No. 98-2017-CIV, 1998 WL 998962, at *4 (S.D. Fla. Nov. 20, 1998); *Se. Mech. Servs., Inc.*, 2008 WL 4613046, at *11; *Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996).

Mr. Carmichael also argues that he did not "misappropriate" the documents because he never used them after sending them to his personal email address. But "[o]ne party can misappropriate another's trade secret by either acquisition, disclosure, or use." *Compulife Software Inc.*, 959 F.3d at 1311 (citing § 688.002(2), Fla. Stat.). "A person misappropriates a trade secret by *acquisition* when he acquires it and 'knows or has reason to know that the trade secret was acquired by improper means.'" *Id.* (emphasis in original) (quoting § 688.002(2)(a)). Both DTSA and FUTSA define "improper means" as including theft and breach of a duty to maintain secrecy. 18 U.S.C § 1839(6)(A); § 688.002(1), Fla. Stat. Even assuming that Mr. Carmichael did not "use" the trade secrets, he still improperly acquired them by sending them to his personal email shortly before he left his employment with Rotech. *See TEKsystems, Inc. v. Andiamo Consulting, LLC*, No. 6:21-cv-1011, 2023 WL 9196643, at *6 (M.D. Fla. Aug. 15, 2023), *report and recommendation adopted*, 2023 WL 9196673 (M.D. Fla. Sept. 12, 2023). Thus, summary judgment must be granted as to Mr. Carmichael's liability for misappropriating Rotech's trade secrets.

## B.    Alleged Violations of the Employment Agreement

Plaintiff moves for summary judgment on its breach-of-contract claims, arguing that Mr. Carmichael breached his employment agreement by violating three restrictive covenants: nonsolicitation, noncompetition, and nondisclosure.

11

(*See* Doc. 1-1). Rotech argues that its restrictive covenants with Mr. Carmichael are binding because it has a legitimate business interest supporting each of them and the restrictive covenants were reasonably necessary to further that business interest. (Doc. 62 at 14–17). In its response, Mr. Carmichael does not contest the validity of the agreements; rather, he argues that a genuine dispute of fact exists as to whether he violated them. These restrictive covenants will be addressed in turn.

### 1.    Nonsolicitation

Rotech claims that Mr. Carmichael breached the nonsolicitation provision of his employment contract, which states, in relevant part, that for twelve months after his employment ends, he "will not directly or indirectly solicit any of the Company's . . . referral sources." (Doc. 1-1 at 4, section 4(A)). "Solicit" is defined in the agreement to mean "any direct or indirect communication or contact of any kind that could reasonably be expected to result in developing a relationship that could generate business which is substantially similar to the business conducted or anticipated to be conducted by the Company." (*Id.*). Examples of solicitation provided in the agreement include inviting referral sources to "sporting events" and "maintaining or starting active connections on social media." (*Id.*). The agreement goes on to specify that "[p]rohibited indirect solicitations include . . . using a third person, company, or vendor to perform the

acts prohibited by this section on behalf of Employee or in conjunction with Employee." (*Id.*).

Under Florida law, solicitation may occur "regardless of whether the customer or employee initiated the transaction," and the proper inquiry is whether the "employee [was] 'proactive' in such efforts [to solicit business]." *Scarbrough v. Liberty Nat'l Life Ins. Co.*, 872 So.2d 283, 285 (Fla. 1st DCA 2004); *Env't Servs., Inc. v. Carter*, 9 So. 3d 1258, 1266 (Fla. 5th DCA 2009). In general, "whether a [former employee]'s behavior is proactive presents a question of fact for the trier of fact." *Convergent Techs., Inc. v. Stone*, 257 So. 3d 161, 167 (Fla. 1st DCA 2018).

Rotech argues that Mr. Carmichael "directly and indirectly solicit[ed] . . . Rotech physician and non-physician referral sources and patient/customers." (Doc. 62 at 19). Rotech posits that "[b]y accepting orders from the very physicians identified on his Rotech Weekly Planner, Carmichael necessarily engaged in the 'contact . . . that could reasonably be expected' to generate competing sales, because an order is the consummation of the relationship-building activities he was prohibited from doing." (Doc. 68 at 3 (quoting Doc. 1-1 at 4)). Rotech points to no specific examples of Mr. Carmichael's breach in the section of its motion pertaining to the nonsolicitation provision. (*See* Doc. 62 at 19–20). The Court is not required to scour the record for evidence of Mr.

Carmichael's breach. *See Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (explaining that "there is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment" (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc))).

Nevertheless, the Court will address an incident Rotech highlights elsewhere in its motion in which a Rotech physician referral source who was listed on Mr. Carmichael's weekly planner purportedly emailed Mr. Carmichael stating: "I had initially intended this order go to [Rotech], but of course now [Rotech] doesn't have you there!" (Doc. 62 at 7 (citing Doc. 63-2 at 148)). But these emails, without more, do not conclusively demonstrate that Mr. Carmichael engaged in solicitation within the meaning of the employment agreement. Missing from the record is whether Mr. Carmichael's contacts could reasonably have been expected to "develop" a business relationship—or whether a business relationship already existed between this Rotech referral source and Total Respiratory before Mr. Carmichael became involved. The nature of Mr. Carmichael's contact with this referral source is also in question, as in the at-issue emails Mr. Carmichael stated he was merely "follow[ing] up" with the referral source on "the order Celine sent over." (Doc. 63-2 at 149). It is also unclear from these emails whether Mr. Carmichael's contacts with this referral

14

source culminated in business to Total Respiratory—and away from Rotech—that would not have happened otherwise. These emails, without more, do not establish that Rotech is entitled to summary judgment.

Further, the record is devoid of evidence that Mr. Carmichael engaged in conduct similar to the nonsolicitation clause's listed examples of proscribed conduct—the procurement of tickets for Rotech clients to attend sporting events and the maintaining of social media connections with Rotech clients. And despite Rotech's allegations, there is no evidence Mr. Carmichael engaged in "indirect" solicitation as defined in the nonsolicitation clause. Rotech has not directed the Court to record evidence demonstrating the absence of a dispute of material fact as to Mr. Carmichael's purported solicitation. Summary judgment must therefore be denied.

### 2. *Noncompetition*

Rotech next claims Mr. Carmichael breached the noncompetition provision of his contract, which states, in relevant part, that for twelve months after his employment with Rotech ends, Mr. Carmichael "will not directly or indirectly engage in the Company's business, or any similar business, within the market area." (Doc. 1-1 at 4 (section 4B)). The contract goes on to define "the Company's business" as "any business engaged in eLearning and performance support solutions and for which Employee had responsibilities during the twelve

15

(12) months preceding the last day of Employee's employment with the Company." (*Id.*). Rotech argues Mr. Carmichael breached the agreement by accepting employment with Total Respiratory where he performs similar job functions as he did with Rotech—selling medical devices in Indiana. (*See* Doc. 62 at 21 (citing Doc. 63-2 at 19:4–6; 32:6–33:5, 47:12–20, 23–24, 54–63)).

"A contract should be read as a whole." *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 44–45 (Fla. 4th DCA 2021) (citing *Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc.*, 929 So. 2d 729, 732 (Fla. 4th DCA 2006)). "Courts must give reasonable meaning to all provisions of a contract, rather than rendering part of the contract useless." *Id.* (citing *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004)). "Specific provisions in a contract control over general provisions." *Id.* at 44–45 (citing *Bridges v. City of Boynton Beach*, 927 So. 2d 1061, 1063 (Fla. 4th DCA 2006)). If a contract is reasonably susceptible to more than one interpretation, it is ambiguous and thus its meaning "is a question of fact requiring the submission of extrinsic evidence to show the intent of the parties when the contract was drafted." *Walsh v. Walsh*, 262 So. 3d 212, 216 (Fla. 5th DCA 2018) (citing *Elias v. Elias*, 152 So.3d 749, 752 (Fla. 4th DCA 2014)). "[A]mbiguous or doubtful language [in a restrictive covenant] is to be construed against the restraint." *Storz Broad. Co. v. Courtney*, 178 So. 2d 40, 42

(Fla. 3d DCA 1965) (citing *Ream v. Callahan*, 136 F.2d 194, 197 (2d Cir. 1943), and *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962)).

Rotech argues that "the pre-hiring materials and the [a]greement [as a whole] demonstrate that the parties' intent was to protect Rotech's interests in the medical equipment industry." (*Id.* at 22–23). That may be. But what is not clear based on the plain language of the contract is the extent to which Mr. Carmichael agreed to be restrained in his post-employment activities by the noncompetition agreement. A restrictive covenant requires mutual agreement to restrict specific conduct—it is not an all-encompassing moratorium on anything Mr. Carmichael might do that Rotech considers harmful. *See Zimmer v. Pony Express Courier Corp. of Florida*, 408 So.2d 595, 597 (Fla. 2d DCA 1981) (explaining that "non-competition agreements "will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires" (citing *Storz Broad. Co.*, 178 So. 2d at 40)).

Again, the contract defines "the Company's business" as "any business engaged in eLearning and performance support solutions and for which Employee had responsibilities during the twelve (12) months preceding the last day of Employee's employment with the Company." (Doc. 1-1 at 4). No definition or description of "eLearning" is provided in the contract. When discussing "eLearning," the parties refer to Mr. Carmichael's employment as beginning

17

during the COVID-19 pandemic but this is not sufficient to provide a meaning for "eLearning." Whether Mr. Carmichael's job functions for Total Respiratory can be fairly described as "eLearning" or "performance support solutions" within the meaning of the noncompetition agreement is uncertain. Also uncertain is the scope of the conduct intended to be proscribed by this provision. It is not sufficient to simply assert that the noncompetition provision was designed to broadly protect Rotech's interests without demonstrating unambiguous contractual instruction as to the parameters of the agreement. Therefore, summary judgment is inappropriate. *Cf. Sasser Funeral Home, Inc. v. McClellan*, 627 So. 2d 1304, 1305 (Fla. 1st DCA 1993) (finding scope of noncompetition provision to be ambiguous and ordering trial court to consider parol evidence as to the parties' intent regarding the meaning of a term).

Rotech also argues that even if the Court reads the noncompetition agreement "narrowly," Mr. Carmichael's role as a Rotech sales representative required him to "continually educate clients and market [Rotech's] services." (Doc. 62 at 23 (citing Doc. 27-4 at 9)). But this does not resolve the difficulty in interpreting the plain meaning of the terms in the parties' contract. It is not clear based on this record whether the job function Rotech refers to is encompassed by the contractual terms "eLearning" or "performance support solutions," or whether Mr. Carmichael performs a similar function at Total

18

Respiratory. Summary judgment must be denied.

Having found that Rotech's claims for breach of contract with respect to the nonsolicitation and noncompetition provisions must be denied, the Court will not rule on the application of the tolling provision of the contract at this juncture because it purports to toll the duration of the nonsolicitation or noncompetition provisions upon violation. (*See* Doc. 1-1 at 5).

### 3.    *Nondisclosure Agreement*

Rotech also argues that Mr. Carmichael violated the nondisclosure covenant in the contract, wherein he agreed that he would not "remove, copy, duplicate, or otherwise reproduce any" of Rotech's trade secrets. (Doc. 1-1 at 3). Rotech points to Mr. Carmichael sending his weekly call planner and call report to his personal email. (*See* Doc. 62 at 25). Because the Court already determined that Mr. Carmichael's emailing himself the weekly call planner and call report was the misappropriation of a trade secret, it therefore follows that he violated the nondisclosure clause of the contract, which expressly prohibits unauthorized removal or copying of a trade secret. *See infra* at 6–12; *see also SMS Audio, LLC v. Belson*, No. 9:16-CV-81308, 2016 WL 8739764, at *5 (S.D. Fla. Aug. 16, 2016) ("For the same reasons stated above regarding misappropriation of trade secrets, [the plaintiff] has shown that [the defendants] shared confidential information . . . [in] violation of their [n]on-[d]isclosure [a]greements.").

19

## C.    Tortious Interference

Rotech argues, without providing any specific examples, that Mr. Carmichael "interfered with" Rotech's business relationships "in breach of his [a]greement with Rotech." (Doc. 62 at 27). Rotech provides no new analysis and does not otherwise "point to undisputed facts establishing that summary judgment is appropriate." *Cluck-U Chicken, Inc. v. Cluck-U Corp.*, 358 F. Supp. 3d 1295, 1315 (M.D. Fla. 2017). To the extent Rotech is rehashing the same arguments it made regarding the nonsolicitation clause, those arguments are rejected for the reasons already stated herein. *See infra* at 12–15. A triable issue exists as to the nature and extent of Mr. Carmichael's contacts with Rotech's clients and the damage done to Rotech as a result. *See also Edmondson v. Caliente Resorts, LLC*, No. 8:15-cv-2672-T, 2018 WL 1565453, at *1 (M.D. Fla. Mar. 30, 2018) (rejecting motion for summary judgment where movant merely recited the legal elements of a claim and concluded that they had been satisfied).

## D.    Damages

Finally, Rotech moves for summary judgment on the issue of damages from Mr. Carmichael's alleged violations of the nonsolicitation and noncompetition provisions. (*See* Doc. 62 at 27–30). Rotech relies on a Total Respiratory spreadsheet that "shows the revenue generated from the doctors in locations in which Mr. Jeffrey Carmichael worked between June 2023 and February 2025." (Doc. 63-3 ¶ 4; Doc. 63-3 at 6–7). Rotech explains that based on

the Total Respiratory spreadsheet, Rotech "compil[ed] data from all matching referral sources that Carmichael also solicited at Rotech" and determined it suffered a profit loss of $1,781,041.92 because of Mr. Carmichael's violations of the nonsolicitation clause and an additional $29,914.20 as a result of Mr. Carmichael's violations of his noncompetition agreement. (Doc. 62 at 28–29 (citing Doc. 63-5)). But having found that an issue of material fact exists as to Mr. Carmichael's purported violations of the nonsolicitation and noncompetition covenants, Rotech's arguments with respect to damages from those purported violations must be rejected. *See Est. of Whidden v. Armor Corr. Health Servs., Inc.*, No. 8:17-cv-2347-T, 2019 WL 12528978, at *6 (M.D. Fla. Sept. 5, 2019) (denying summary judgment on damages where it was also denied on liability).

## IV.    CONCLUSION

As explained above, it is **ORDERED** and **ADJUDGED** that Rotech's motion for summary judgment (Doc. 62) is **GRANTED in part and DENIED in part**. Rotech is entitled to summary judgment as to Mr. Carmichael's liability for misappropriation of trade secrets and breach of the nondisclosure agreement as stated herein. The motion is denied in all other respects.

**DONE** and **ORDERED** in Orlando, Florida, on October 9 , 2025.

JOHN ANTOON II
United States District Judge

Copies furnished to:

Counsel of Record